PER CURIAM.
This is a suit by the plaintiff taxpayers to enjoin the consummation of a proposed industrial development plan to be entered into by the defendant Industrial Development Board of Parish of Rapides, Inc. (hereinafter “Development Board”), a pub- *133 lie corporation created as authorized by the Police Jury of Rapides Parish under the provisions of LSA-R.S. 51:1151 — 1165 (Act 436 of 1962, as amended by Act 433 of 19-64). The Development Board and the Police Jury are made defendants. The plaintiff taxpayers primarily contend that the statute is unconstitutional as violating a provision of the state constitution which prohibits the lending or use of the credit or property of the State or any of its political corporations to any person, association, or corporation, public or private. The plaintiffs contend that therefore any acts done by virtue thereof are invalid, such as the proposed development plan. The plaintiffs also contended in the trial court that other constitutional provisions are offended by the activities sought to be enjoined.
After trial on stipulations, the trial court held that the statute and the proposed development plan was constitutional. Accordingly, the plaintiff taxpayers suit was dismissed. They appeal to this court.
The Constitutional provision which the plaintiffs allege is offended by the questioned statute and industrial development plan is Article IV (“Limitations”), Section 12, Louisiana Constitution of 1921, which pertinently provides:
“The funds, credit, property or things of value of the State, or of any political corporation thereof, shall not be loaned, pledged or granted to or for any person or persons, associations or corporations, public or private; nor shall the State, nor any political corporation, purchase or subscribe to the capital stock or stock of any corporation or association whatever, or for any private enterprise. Nor shall the State, nor any political corporation thereof, assume the liabilities of any political, municipal, parochial, private or other corporation or association whatsoever, except as otherwise provided in this Constitution; nor shall the State undertake to carry on the business of any such corporation or association, or become a part owner therein; * * (Italics ours)
In summary: LSA-R.S. 51:1151-1165 authorizes the incorporation in municipalities and parishes of public corporations to acquire, lease, and dispose of properties for purposes of industrial development. 1152. These public corporations may be formed only if authorized after application by resolution of the municipality or parish governing body. 1153. Bonds to be issued by the corporation to carry out its purposes are payable solely out of revenues and receipts from the leasing or sale by the public corporation of its projects. 1158. The principal and interest of any bonds shall be secured by a pledge of the revenues and receipts out of which payable, or may be secured by a mortgage of the projects from the revenues may be derived. 1159. In no event shall the parish or municipality be liable for any of the obligations of the public development corporation so authorized. 1161. The corporation shall be nonprofit, with any net earnings or proceeds upon dissolution to go to the municipality or parish. 1162, 1163. The public development corporation, its income and bonds and the income therefrom, shall be exempt from taxation in the state except for ad valorem taxes. 1160.
The present taxpayers’ suit seeks to enjoin consummation of a proposed industrial development plan by the Development Board through the leasing by it to a private corporation of certain property and facilities to be constructed by the Development Board through the issuance of revenue bonds.
In their principal contention that LSA-R.S. 51:1151 et seq. and any action taken thereunder violates Article 4, Section 12, Louisiana Constitution, the plaintiffs suggest that in effect the Development Board is the alter ego of the Police Jury, so that what is prohibited to the Police Jury should be prohibited to the latter public corporation. The plaintiffs also contend in effect *134 that the Police Jury is unconstitutionally lending its credit for a private enterprise, and that nowhere in the State Constitution is activity such as that sought to be enjoined authorized as an exception to Article 4, Section 12.
In this latter connection, the plaintiffs point out that Article 14, Section 14(m) is only applicable to public utilities and does not appertain to an industrial plant such as the Development Board intends to acquire, and that Article 14, Section 14(b.2), authorizes debt and the issuance of bonds for the encouragement of industrial enterprises only through the creation of an “industrial district” with bonds not to exceed 20% of the assessed valuation of the taxable property of the parish (the present Development Board intending to issue bonds in excess of such percentage in relationship to the assessed property). With regard to the latter constitutional provision, the plaintiffs thus contend that the procedures permitted by LSA-R.S. 51 1151 et seq. are not in accordance with those authorized by Article 14, Section 14(b.2), so that the present industrial development plan cannot be said to be authorized by this provision which allegedly provides the exclusive constitutional method whereby public bodies can encourage industrial activity of the sort intended here.
While the principal contention is that the statute attacked and the Development Board’s industrial development plan violates Article 4, Section 12, there are also contentions that the due process provisions of the federal and state constitutions are violated (Article 1, Section 2, Louisiana Constitution; Fifth and Fourteenth Amendments, United States Constitution), and that the Development Board’s issuance of bonds and incurment of debt is in violation of taxing and debt restrictions applicable to parochial and municipal corporations (Art. 10, Section 5, and Art. 14, Sections 14(f) and 14(b.2).)
All of these contentions are in our opinion most ably summarized and disposed of by the opinion of the District Court. We therefore adopt it as our own as follows, omitting quotation marks, with inserts shown in brackets:
The said Police Jury acting under the authority of Act No. 436 of 1962 (R.S. 51 :- 1151 et seq.) on November 9, 1965, adopted a resolution finding and determining it to be wise, expedient, necessary and advisable that a corporation to be known as “The Industrial Development Board of the Parish of Rapides, Inc.” be formed for certain purposes stated in the resolution authorizing the persons who had applied for permission to create such corporation to so proceed.
Pursuant to this resolution proceedings for the creation of said corporation were duly taken, and on November 9, 1965, Articles of Incorporation for said corporation were duly executed and filed, as required by law, in the office of the Secretary of State of Louisiana, and were duly recorded in the office of the Clerk of Court and ex-officio Recorder of mortgages and documents.
On November 9, 1965, the Board of Directors of said corporation theretofore elected by said Police Jury met and organized, and following a general discussion of certain immediate plans of the Board adopted by-laws in pursuance to the authorizing resolution.
Admittedly, plans have been projected and steps have been taken to negotiate and consummate a certain lease with said Southern Paper, acquiring and leasing to said company certain lands in the Parish of Rapides, and on which said Development Board proposes to construct buildings comprising a manufacturing plant and appurtenant facilities for the manufacturing, processing, storing, warehousing, distributing and selling of (1) pulp paper, paper board or paper products, or (2) such other products as the said Southern Paper may deem appropriate, and for the acquisition and construction and installation of other facilities necessary for the operation of the *135 project, to provide the money for which the Development Board proposes to issue and to sell, as is provided under R.S. SI :1151 et seq., bonds for an amount in principal in excess of $20,000,000.00, for all purposes required.
Further, that under the provisions of the proposed lease the land, with the manufacturing plant and pertinent facilities to be acquired and constructed with the proceeds of the bonds of the Development Board, are to be leased to said Southern Paper under provisions which will require Southern Paper to pay all expenses of operating and maintaining such facilities, including all taxes of whatever nature which are imposed on the property, to pay rentals to the Development Board which will be sufficient in amount for the Board to meet, when due, all installments of principal and interest with respect to the bonds of the Development Board that Board will issue to provide funds for the purposes shown; and to pay all overhead and administrative expenses of the Development Board in connection with the project pursuant to which, when the bonds of the Development Board have been fully retired and the obligations of the Development Board have been paid in full, title to the property comprising the project will vest in the Parish of Rapides should Southern Paper fail in the meantime to exercise an option to purchase such property at a price and on terms to be stipulated in the lease.
Showing is made that while no specific plan has been consummated to date, all parties were advised when the negotiations were started and the plans were initiated that all of the proceedings depended upon the legality and constitutionality of Act No. 436 of 1962, as amended (R.S. 51:1151 et seq.), and that a pre-determination of these issues would be required to make the plan economically feasible.
The legality and validity of said lease and the acquisition of the industrial facilities contemplated thereby and the issuance of bonds of said Development Board contemplated are dependent entirely on the validity and constitutionality of R.S. 51:11-51, et seq., aforesaid.
[The Development Board under the terms of the statute is a public corporation, invested with such immunities, rights and privileges as to the functions defined in the statute as apply to any other public board appointed by the Police Jury. The legislative intent as expressed in LSA-R.S. 51:-1152 is “[T]o authorize the incorporation in the several municipalities or in the parishes in this state of public corporations to acquire, own, lease and dispose of properties to the end that such corporations may be able to promote industry and develop trade by inducing manufacturing, industrial and commercial enterprises to locate in this state and, further, the use of its agricultural products and natural resources, and to vest such corporations with all powers that may be necessary to enable them to accomplish such purposes.”
[The essential public status of such corporations with power to serve the public welfare is plainly shown in all the provisions of the statute. The statute by its terms is to be liberally construed “in conformity with the intention” expressed therein (LSA-R.S. 51:1152).
[The provisions contained in the statute anticipate the same purposes and generally are similar to the other laws of Louisiana governing industrial development under the State’s industrial inducement plan, such as Article 14, Section 14(b.2) of the Constitution, which anticipate cooperation between the public authority and a sound private interest for the acquisition of sites and the construction of essential industrial improvements to be leased and/or sold to the private industry under terms to be worked out with this industry by negotiation so as to insure the full payment of the principal and interest of the indebtedness incurred by the public corporation, as well as the payment of all other operation and maintenance’ costs and expenses.]
*136 The said statute is alleged to be unconstitutional and void upon the grounds that a private rather than a public purpose is involved, contrary to the provisions of Section S of Article 10, Section 12 of Article 4, and the due process clause of Section 2 of Article 1 of the Louisiana Constitution and the Fifth and Fourteenth Amendments of the Constitution of the United States; that the performance of the acts contém-plated by said statute will violate Section 12 of Article 4 of the Louisiana Constitution in that the lease to be executed thereunder and the bonds to be issued by said Development Board pursuant thereto will result in the loaning, pledging or granting of public funds, credit, property and things of value to or for a person or persons and to or for a person or a corporation public or private; in that such acts will constitute the assumption by a political corporation of the liabilities of a corporation or association, and in that such acts will constitute the carrying on by a public subdivision or corporation of the state of the business of a private corporation or the becoming of a part owner therein; that the issuance of the bonds contemplated by said statute will cause to be violated the provisions of sub-section (f) of Section 14 of Article 14 of the Louisiana Constitution that no parish shall incur any debt and issue bonds therefor which shall cause the bonded indebtedness of such parish to exceed in the aggregate ten per centum of the assessed valuation of the taxable property thereof for any one purpose, and sub-section (b.2) of said Section 14 of Article 14 that no parish may issue bonds in excess of twenty per centum of the assessed valuation of taxable property thereof for the purpose of acquiring or constructing industrial plant buildings and acquiring industrial plant sites and other necessary property and appurtenances, as to which the bonds here proposed will cause both limitations to be exceeded, and in that said Industrial Development Board is merely the alter ego of the parish for the- purpose of the issuance of such bonds and is subject to said limitations; and, further, that said statute violates Section 2 of Article 4 of the Constitution in that it purports by legislative action to create a debt or liability against the State, and to issue bonds related thereto without constitutional sanction.
Petitioners allege that the plan will be consummated unless the injunctive relief sought is granted, and that they have no adequate remedy at law, and that their rights as voters and qualified electors and taxpayers will be irreparably damaged, as well as the rights of all the citizens, qualified electors and taxpayers of the State of Louisiana. Relief is sought preliminarily enjoining and restraining the said defendants from taking any further action whatever in respect to the consummation of the proposed plan as to the proposed lease agreement and all transactions related to it, and from authorizing and selling any proposed revenue bonds, and from taking any further steps and doing any act or thing required under the plan.
On the merits similar permanent injunc-tive relief is asked for and by appropriate stipulations the issues are submitted as to both the preliminary and the permanent remedies prayed for.
In essence all of these issues are resolved upon the basis of the distinction between a private and a public purpose, as is really the basis for the pleas relied upon. This distinction is inherent in the very language of said provisions, except as to Section 12 of Article 4, where in establishing the prohibition denying the use of public credit reference is made “to or for any person or persons, associations or corporations, public or private”, as admittedly here the Industrial Development Board under the express provisions of the statute is a public corporation.
[However, since the bonds and obligations are the sole obligation of the public corporation created as authorized by the police jury, they do not amount to pledging the credit of the State or its police jury *137 subdivision to a public corporation in violation of the constitutional provision in question. As expressly held rejecting similar contentions in State ex rel. Porterie v. Charity Hospital of New Orleans, 182 La. 268, 161 So. 606, 608-609:
["The fourth contention of the Attorney General is that Act No. 166 of 1934 is unconstitutional because it pledges the credit of the State to a public corporation in violation of article 4, § 12, of the 1921 Constitution. In view of the language of the act, which expressly declares that the bonds shall be solely the obligations of the Board of Administrators and shall not be obligations of the State of Louisiana, the contention is untenable that these bonds will be backed by the credit of the State. The Supreme Court recently held, in the case of Caldwell Brothers v. Board of Supervisors of Louisiana State University, 176 La. 825, 147 So. 5, where the identical question was raised, that inasmuch as the bonds authorized to be issued by the Board are issued for its own exclusive purposes and benefit, the credit of the State was not pledged to their re-payment. Similar cases are Benedict v. City of New Orleans, 115 La. 645, 655, 39 So. 792; and Excelsior Planting & Manufacturing Co. v. Green, 39 La.Ann. 455, 1 So. 873.”]
[Further,] this Section 12 of Article 4 has been consistently interpreted by the Attorney General of this State as well as by the Supreme Court as having application only where a private purpose is involved, and not where a public purpose is involved, despite the reference to “public corporations” shown.
Attorney General Opinions, 1948-1950, page 323
Caldwell Bros. v. Louisiana State University, 176 La. 825, 147 So. 5
Emery v. Orleans Levee Board, 207 La. 386, 21 So.2d 418
Miller et al. v. Greater Baton Rouge Port Commission, 225 La. 1095, 74 So. 2d 387
State ex rel. Kemp, Atty. Gen. of Louisiana v. City of Baton Rouge, et al., 215 La. 315, 40 So.2d 477
In Miller v. Police Jury of Washington Parish, 226 La. 8, 74 So.2d 394, the Police Jury of Washington Parish initiated a plan similar to the present under a constitutional provision to acquire lands and to build a milk processing plant, and to lease the facilities to a private corporation to be devoted to dairying and the production of milk. It was shown that there had been a decline in milk production due to market disadvantages, and that this caused the actual dumping of a great quantity of milk and inadequate prices, and otherwise created a serious economic deficit in the business potential of the area. There, of course, a constitutional authorization was involved where rather than relying strictly upon revenue bonds, as is true under the present statute, the Parish voted an unlimited property tax millage securing the revenue bonds required. There, the point was argued that Article 14, Section 14(b.2) violated the Fifth and Fourteenth Amendments to the Constitution of the United States, as an unwarranted diversion of public funds to a private purpose and, thus, representing a denial of equal protection of the laws, and the wrongful appropriation of property by private interests without due process of law.
The Supreme Court in that case held that the amendment in question permitting municipalities to incur debt and to issue bonds for acquisition of industrial sites to be leased or disposed of to an appropriate enterprise pertained to a matter of public interest, and was not unconstitutional as authorizing the taking of private property and taxation for private purposes where it was applied to the acquisition by the Parish of a site for a milk processing plant necessary to secure a market for the milk output of the area.
*138 The Court was specifically passing on Amendments 5 and 14 of the United States Constitution, as shown.
In the case of Albritton v. City of Winona, 181 Miss. 75, 178 So. 799, 115 A.L.R. 1436, discussed by the Supreme Court in the Miller case, it was pointed out that a statute had been under interpretation in Mississippi involving similar industrial planning, and contested on the ground that it did violate the due process law of the Federal Constitution. In that case the Supreme Court of Mississippi sustained the constitutionality of the statute, and an appeal prosecuted to the United States Supreme Court was dismissed for lack of a substantial Federal question.
We quote from the decision of the Supreme Court in the Miller case, supra, where the Albritton case is discussed, the following relevant observations.
“ * * * As far back as the year 1920 it was pointed out in Green v. Frazier, supra, [253 U.S. 233, 40 S.Ct. 499, 502 [64 L.Ed. 878]], that the peculiar conditions existing in a state, which are emphasized in an opinion of its highest court, if the state sees fit to enter upon enterprises with the sanction of its constitution, its legislature and its people, that the Supreme Court of the United .States were not prepared to say that it was within their authority, in enforcing the observance of the fourteenth amendment to set aside such action by judicial decision and it was further pointed out that ‘In many instances states and municipalities have in late years seen fit to enter upon projects to promote the public welfare which, in the past have been considered entirely within the •domain of private enterprise.’ As pointed out in the Albritton case (Albritton v. City of Winona, supra), there is a .growing appreciation of public needs ■and a necessity of finding ground for a rational compromise between individual rights and public welfare. Reference was made therein to the words of John Marshall that a Constitution is:
‘ “* * * intented to endure for ages to come, and, consequently, to be adapted to the various crises of human affairs. To have prescribed the means by which government should, in all future time, execute its power, would have been to change, entirely, the character of the instrument, and give it the properties of a legal code. It would have been an unwise attempt to provide, by immutable rules, for exigencies which, if foreseen at all, must have been seen dimly, and which can be best provided for as they occur.” McCulloch v. [State of] Maryland, 4 Wheat 316, 415, 4 L.Ed. 579.’ [181 Miss. 75, 178 So. 806.]”
While our Supreme Court mentions the fact in the decision that a state constitutional authorization was under interpretation, many if not most of the authorities referred to, such as the Albritton case, supra, depended only upon a state statute.
The fact that the United States Supreme Court found lack of a substantial Federal question in the Albritton case shows that that Court did not consider that state action dependent wholly upon a state statute alone had any bearing upon the question, or that this fact would change the results arrived at by the Courts.
Economic impact in the area is shown to be of importance under the statute, and here the proof relied upon is even more convincing as to the importance of the proposed pulpwood plant in Rapides and in the whole Central Louisiana area.
Statements of F. Hugh Coughlin, a resident of Alexandria, Louisiana, for approximately twenty years, during which he has served as President and more lately as Chairman of the Board of Central Louisiana Electric Company, and James C. Bolton, a native of the Parish and Chairman of the Board of Directors of Rapides Bank *139 and Trust Co. in Alexandria, are relied upon.
The competency of these men in the field of economic development is recognized in Louisiana and throughout the South. Both have devoted a great amount of time in seeking to bring into the area a paper mill or an industry of similar nature, “that would make use of the ample supply of pine and hardwood” in Rapides and in the adjoining Central Louisiana parishes. They both testify that such an enterprise “would materially enhance the economic progress of the area in that it would mean a better market for the standing and growing timber”, and it is shown by these witnesses and in the stipulation that there has been and is an imbalance presently existing as to the timber potential and the present available market, as well as between non-industrial employment and presently existing industrial employment.
As the Supreme Court found in the Washington Parish case that the milk processing plant was an enterprise “unquestionably fraught with public interest”, we believe that the same conclusion must be arrived at here.
As to the question of public purpose it is manifest that our Supreme Court as well as the Supreme Court of the United States did not base their conclusions upon any distinction between a statute and a constitutional amendment, as shown. The real governing distinction to be noted here is that under provisions of our State Constitution as embodied in Article 14, Section 14 (b.2) and other provisions of the Constitution where a property tax millage is involved, the people of the area must vote upon the issue, and the relevant constitutional provisions must be complied with.
Such was the situation in the Washington Parish case where an unlimited property tax was actually voted by the people to secure the revenue bonds involved. Here, on the other hand, R.S. 51:1151 et seq., expressly provides that any bonds issued “shall be secured by a pledge of the revenues and receipts out of which the same are made payable, and may be secured by a mortgage covering all or any part of the projects from which the revenues or receipts so pledged may be derived, including any enlargements of and additions to any such projects thereafter made,” and provides in R.S. 51:1161 that the parish “shall not in any event be liable for the payment of the principal of or interest of any bonds of the corporation, formed thereby or for the performance of any pledge, mortgage, obligation or agreement of any kind whatsoever which may be undertaken by the corporation, and none of the bonds of the corporation * * * [are] an indebtedness of the municipality or parish within the meaning of any constitutional or statutory provisions whatsoever.”
The decisions of our Supreme Court establish beyond question that the Legislature has the power to adopt any kind of a law having to do with a public interest that is not expressly prohibited by the State and Federal Constitutions, and under all of these cases the distinction between a revenue bond and a property bond as to the number of bonds allowed is recognized, and consistently, too, our courts have sanctioned a variety of revenue bonds of one kind or another dependent only upon statutory authority.
Here, in the first place, under Article 14, Section 14 (m) related to public utilities, resort to revenue bonds is authorized in any marketable amount to extend over a period not to exceed forty years, and the express language is used that such bonds “shall not be a charge upon any income or revenue of the district or municipality not derived from the utility, and shall not be included in computing the indebtedness of the subdivision or district, for the purpose of any limitation contained in the Constitution.”
A number of decisions of the Supreme Court of this State also treat with debt *140 limitation under the constitution as well as specifically with the issue here relied upon that such a debt contracted by a public corporation or a political subdivision amounts to the contracting of a debt or liability on behalf of the State in the sense of violating Section 2 of Article 4, where if such were the case a constitutional authorization would be required.
The limitations of Article 14, Section 14, and Article 14, Section 14 (b.2) of the State Constitution restricting debt limitation for any one project generally to ten per cent and/or in other instances to fifteen per cent and twenty per cent as under Article 14, Section 14 (b.2) are inapplicable where a revenue bond only is authorized. If this were not the case a large portion of the existing public debt in Louisiana by both the state and the political subdivisions of the State would be without legal or constitutional justification. The instances seem numerous where revenue bonds only have been authorized and sold upon statutory authority alone, and where manifestly if the debt limitations established in Article 14, Section 14 and other provisions of the State Constitution were held to be applicable, the issuance of these revenue bonds in most instances would have been impossible.
Here, for example, if the number of revenue bonds were restricted to ten or even twenty per cent of the parish assessment, shown to be the sum of $74,476,730, manifestly the twenty or more millions of dollars contemplated here would greatly exceed any such limitations.
During the Davis administration, the State Bond and Building Commission was created by Act No. 112 of 1960. This Commission was authorized to issue, and actually issued, $60,000,000 of bonds purely upon the basis of this statutory authorization.
During the McKeithen administration, Act. No. 112 of 1960 was amended so as to authorize the issuance of an additional $35,000,000, and of this authorization $25,-000,000 in bonds have actually been issued down to the present time.
Article 14, Section 14 (b.2) anticipates the right on the part of a parish or of a city to construct industrial plant buildings and to acquire industrial plant sites and other necessary property and appurtenances, and to issue property bonds and to secure the entire cost out of a property millage, and in connection therewith to dedicate the revenues derived from any lease of the project in providing and maintaining a “sinking fund” out of which these property bonds are to be paid. Thus, this Article plainly establishes a legislative policy for industrial inducement in this State which goes far beyond the present R.S. 51:1151 et seq., restricted as it is to revenue bonds secured solely out of the revenues.
The twenty per cent limitation in Article 14, Section 14 (b.2) manifestly applies only to the property taxes levied to-support any such issue.
Here, while — in view of Article 14, Section 14 (b.2) — there is little merit in the suggestion that R.S. 51:1151 et seq. is without constitutional contemplation, the Supreme Court of this state has consistently rejected the need for express constitutional sanction where only revenue bonds are involved in a number of cases where all the constitutional issues relied upon were raised.
Some of the relevant cases include the following:
Middleton v. Police Jury, 169 La. 458, 125 So. 447.
State ex rel. Porterie v. Louisiana State Board of Education, 190 La. 565, 182 So. 676.
State ex rel. Porterie v. Charity Hospital of Louisiana at New Orleans, 182 La. 268, 161 So. 606.
Stovall v. City of Monroe, 199 La. 195, 5 So.2d 547.
*141 In the Middleton case, supra, a waterworks district created by the Legislature was involved. It was contended that the act of creation, Act No. 343 of 1926, was illegal and without effect because of a proviso contained in the Act that it should not take effect unless a proposed constitutional amendment to Article 14, Section 14 of the Constitution was adopted. It was further contended that the proposed amendment to the Constitution was not effectively adopted inasmuch as a later proposed amendment omitted waterworks districts from the enumeration of subdivisions of the state. The court found and held that there was no conflict between the two amendments, and that they should be construed together, and that the proposed amendment which specifically enumerated waterworks districts had been adopted. The Court stated that if the proposed amendment in which waterworks districts was mentioned had failed, then there would have been no legislative authority for the creation of waterworks districts by the police jury because of the proviso in Act. No. 343 making the act depend upon the adoption of the proposed constitutional amendment. However, the Court said the following which disposes of the issue here presented:
“We do not mean to say that the Legislature could not have authorized the police juries to create waterworks districts without constitutional authority, since the authority of the Legislature is supreme, except where restrained by the state or federal Constitutions.
“But Act No. 343 did not confer such authority on the police juries without reservation, but conferred it only in the event the first amendment was adopted and became effective.”
It was further contended in this case that the said Act 343 of 1926 was without constitutional sanction, and also violated Article 4, Section 2 of the State Constitution.
It is also to be noted that in that case the Act of the Legislature under interpretation, B.S. 39:991, in Section 993, restricted the debt to revenue bonds secured only by mortgage of the enterprise and pledge of the revenues to be derived therefrom, just as in the case here.
The case of State ex rel. Porterie v. Louisiana State Board of Education, supra, is also relevant.
There, an attempt was made to declare Act No. 6 of 1938 unconstitutional. This act authorized and directed the Louisiana State Board of Education to improve the facilities at the educational and charitable institutions of the state, and in order to obtain funds for this purpose, the Board was authorized and empowered to borrow not exceeding six million dollars, and to evidence the debt created by the issuance of bonds of the Louisiana State Board of Education. It was contended that the act was unconstitutional, among other grounds, in that it violated Article 4, Section 2 of the Constitution. In answer to this contention the Supreme Court said:
“The first ground of attack is that, the Louisiana State Board of Education created by Section 4, Article 12, of the Constitution, being a State agency, any debt or liability contracted by the said Board would be a debt or liability of the State of Louisiana, and that any bond or other obligation issued by it would be a bond or obligation of the State. Therefore it is alleged that said act violates Section 2 of Article 4 of the Constitution, which provides that ‘The Legislature shall have no power to contract or to authorize the contracting of any debt or liability on behalf of the State’.
“There is no merit in the attack on the act on this particular ground. The act in Section 3 specifically provides that:
“ ‘Said bonds or obligations shall be solely the obligations of the Louisiana State Board of Education, and shall not be the obligations of the State of Louisiana.’ ”
“The rulings in Caldwell Bros. v. Board of Sup’rs. of Louisiana State University, *142 176 La. 825, 147 So. 5, and in State, ex rel. Porterie v. Charity Hospital of Louisiana at New Orleans, 182 La. 268, 161 So. 606, are in point and are decisive on this question.”
In State ex rel. Porterie v. Charity Hospital of Louisiana at New Orleans, supra, it was contended that Act 166 of 1934 authorizing the Board of Administrators of the Charity Hospital of Louisiana at New Orleans to demolish certain buildings, to erect new ones, and to borrow money with which to accomplish this and to issue bonds, and to pledge revenues to secure the bonds, violated Article 4, Section 2 of the 1921 Constitution in that it authorized the Board to incur debt on behalf of the State. In answer to this contention the Supreme Court said:
“In regard to the second contention of the Attorney General, that Act 166 violates article 4 of section 2 of the 1921 Constitution in that it authorizes the Board of Administrators to incur a debt on behalf of the State, the jurisprudence is settled that bonds and debts of State Agencies, which are separate and distinct legal entities, are not debts or liabilities of the State,” citing cases.
Further in the same opinion the following statement is made:
“ * * * In addition, it is fundamental law that the Legislature has all powers of legislation not specifically denied it by the Constitution. There being no prohibitive restriction in the Constitution, the Legislature has full authority to pass legislation of this type.”
In the case of Stovall v. City of Monroe, supra, Act 251 of 1940 was enjoined as unconstitutional, where the City of Monroe was authorized to improve municipally owned public utilities. In that case the point was made that Article 14, Section 14, Sub-section (m) did allow the Legislature to empower Monroe to borrow money and to mortgage and pledge the public utility, but that the Legislature under Act No. 251 of 1940 was without authority to allow a pledge of the revenue only as the constitutional provision, that is, Article 14, Section 14, Sub-section (m) was the only and the exclusive method required, and that an act of the Legislature as did Act No. 251 of 1940, which did not provide for a mortgage but which did provide for only a pledge of revenues did not conform to the constitutional requirements.
There, the Supreme Court covered very emphatically the point which is controlling here:
“The Legislature under our law is empowered to pass any law not prohibited by the Federal and State Constitutions.
“From a reading of this Section of the Constitution it appears that it was intended merely as a special provision for the floating of bonds for the purpose of raising revenues to extend and improve revenue producing public utilities and not as a general limitation upon the action of the Legislature in the future. It merely provides one method by which the utilities may be improved, but does not indicate that this is the exclusive method.”
The Supreme Court in that case continued as follows:
“Moreover, if the authority for Act 251 of 1940 must be derived from this Section of the Constitution the Act is not inconsistent with it. The Act follows the Article of the Constitution except part of the security is omitted and certificates are to be issued rather than bonds. If the Legislature wishes to limit the amount of the security and provide for a pledge of the revenues without a mortgage on the properties it would not violate the Constitutional provision. The only persons that could be affected would be the holders of the certificates and they are making no complaint. The Act would not be unconstitutional because it does not impose the greatest burden provided for in the Constitution. The greater includes the lesser and the securities involved *143 herein are within the constitutional provision.”
******
The right of the Police Jury of the parish to create the Industrial Board here is further supported by State ex rel. Porterie, Attorney General v. Housing Authority of New Orleans, et al., 190 La. 710, 182 So. 725. In that case an attack was made on Act 275 of 1936, known as the “Slum Clearance Housing Authority Act,” which Act authorized the creation of housing authorities in every city of the State having a population in excess of twenty thousand inhabitants, and authorizing such authorities to issue bonds and other obligations and to secure them by mortgage on their real property or by pledge of their revenues. It was therein contended that in effect the housing authority is a municipal corporation within the meaning of Article 14, Section 14 of the Constitution and therefore it could issue bonds only in the manner set forth in sections (a) and (m) of Article 14, Section 14, and that neither was being complied with. The Court in that case held that housing authorities were not municipal corporations within the meaning of Article 14, Section 14 (a) and (m), and further held that such authorities had the power and authority to issue bonds which, under the specific provisions of the Act did not constitute an indebtedness or obligation within the meaning of any constitutional or statutory debt limitation or restriction, without constitutional sanction.
For all of the foregoing reasons, judgment is rendered in favor of defendants, Police Jury of the Parish of Rapides and The Industrial Development Board of the Parish of Rapides, Inc., and against the plaintiff taxpayers, J. Hall LeBlanc and Dennis M. Dinnat, recognizing the legality and constitutionality of Act No. 436 of 1962, as amended (R.S. 51:1151 et seq.), and the legality and constitutionality of the proposed industrial plan to be carried out under that law, recalling the rule for preliminary injunction and rejecting plaintiffs’ demand for injunctive relief either by preliminary or permanent injunction, and, finally, dismissing the plaintiffs’ suit at the plaintiffs’ cost. * * *
We agree with the reasoning and the result reached by the District Court. We therefore affirm its decision dismissing the plaintiffs’ suit at their cost.
Affirmed.